# In the United States Court of Federal Claims

| | |
|---|---|
| TRAX INTERNATIONAL CORP.,<br>*Plaintiff,*<br>v.<br>THE UNITED STATES,<br>*Defendant,*<br>and<br>SOUTHWEST RANGE SERVICES, LLC,<br>*Defendant-Intervenor.* | No. 26-796<br>(Filed: September 22, 2026)[1]<br>Filed under seal: September 3, 2026<br>Reissued: September 22, 2026 |

*Daniel Graham*, McDermott Will & Schulte LLP, Washington, D.C., for Plaintiff.

*Daniel Hoffman*, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

*Craig Alan Holman*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Defendant-Intervenor.

**OPINION AND ORDER**

**LERNER,** *Judge*.

## I. Introduction

Plaintiff TRAX International Corp. ("TRAX") brings this post-award bid-protest suit challenging a contract award by the U.S. Army ("Army" or "Agency") for Mission Support Services on a military base in New Mexico. *See generally* Compl., ECF No. 1. The Parties' Cross-Motions for Judgment on the Administrative Record ("AR") are now ripe for decision. Pl.'s Mot. for J. on Admin. R. ("Pl.'s MJAR"), ECF No. 36; Def.'s Cross-Mot. for J. on Admin. R. ("Def.'s MJAR"), ECF No. 40; Def.-Intervenor's Cross-Mot. for J. on Admin. R. ("SRS's MJAR"), ECF No. 39. Plaintiff claims the Army's decision to award a test and evaluation services contract to Southwest Range Services, LLC ("SRS") was arbitrary, capricious, an abuse of discretion, and contrary to law. Compl. at 1.

TRAX seeks to enjoin performance of the Mission Support Services ("MSS") contract awarded to SRS. Plaintiff asks the Court for permanent injunctive relief on the grounds that

[1] This Opinion was filed under seal on September 3, 2026. ECF No. 70. The parties jointly proposed redactions. ECF No. 75. Accordingly, the Court reissues this Opinion with the agreed upon redactions, which are noted with bracketed asterisks ([***]).

errors were committed during the procurement process which prevented TRAX from being awarded the contract.

Specifically, TRAX argues "[b]ut for the unreasonable and unsupported Factor 1 findings, and the false equivalency assigned to the offerors under Factor 2, there is a substantial chance that the Army would conclude that SRS's proposal is not worth SRS's $29.4 million cost premium." Pl.'s MJAR at 2. TRAX also claims, because SRS did not possess an adequate accounting system, it should have been precluded from winning the contract. *Id.* at 7–11. Finally, TRAX alleges the Army's investigation into SRS's organizational conflict of interest ("OCI") was incomplete and, therefore, the decision made based on this investigation was arbitrary and capricious. *Id.* at 26–28.

TRAX also maintains the Army's technical evaluation of Plaintiff's proposal contained multiple Artificial Intelligence ("AI") "hallucinations" which gave the false impression that SRS's proposal was technically superior to TRAX's. Compl. ¶¶ 62–67. TRAX moved to complete the AR with three proposal evaluations generated by AI corresponding to each of the three offerors in this procurement. Mot. to Complete the Admin. R. ("Mot. to Complete"), ECF No. 28. Briefing on TRAX's Motion to Complete concluded on July 9, 2026. The Court granted Plaintiff's Motion as to all three AI-generated documents in a short Order on July 10, 2026, noting that further explanation would follow; that explanation is included below. *See infra* Part III.

## II. Background and Procedural History

### A. Solicitation and Evaluation

On May 22, 2025, the Army issued a Solicitation and Request for Proposals under Solicitation No. W51EW7-25-R-A003 ("RFP"). Tab 94 at AR 1442. The RFP sought proposals for support services at the White Sands Missile Range ("WSMR"), an open-air munitions test range, for "experimentation, test, research, assessment, development, and training in support of National Security." *Id.* at AR 1443. The award was for a single cost-plus-fixed-fee contract with a 3-month phase-in period, 9-month base period, four 12-month option periods, and a 6-month option to extend services. *Id.* at 1443–52.

The Army evaluated proposals on four factors: (1) Mission Capability, (2) Past Performance, (3) Small Business Participation, and (4) Cost/Price. Tab 122 at AR 2142. The factors were listed in descending order of importance (i.e., Factor 1 was the most important and Factor 4 was the least important). *Id.* Factor 1 (Mission Capability) contained two subfactors: (a) Management and Staffing and (b) Continuity of Operations. *Id.* Between these subfactors, Management and Staffing was significantly more important than Continuity of Operations. *Id.* The RFP stated the non-Cost/Price factors, when combined, were significantly more important than Factor 4, Cost/Price. *Id.*

To allow for complete review of the Management and Staffing subfactor, offerors were to provide details including personnel resumes, organizational flow charts describing management and team structure, and explanations on their approaches to decision-making, responsibility division, and problem resolution. Tab 132 at 2405–06. Offerors were also asked to explain their approach to unexpected shifts in staffing requirements. *Id.*

Under the Continuity of Operations subfactor, the RFP required offerors to submit a transition plan that would "minimiz[e] disruption of operations" and allow them to assume the responsibilities of the contract "without disruption or degradation of performance." *Id.* at 2406. The RFP also provided that the Army would assess the "recency, relevancy, source and context of the past performance information," and assign a performance confidence assessment rating based on that evaluation. Tab 122 at AR 2147–48.

Three timely proposals were submitted in response to the RFP: TRAX, SRS, and a third bidder, [***], which is not party to this suit. Tab 262 ("Final Source Selection Decision Document ("SSDD")) at AR 5116. TRAX's and SRS's proposals were evaluated by the Army's Source Selection Evaluation Board ("SSEB"), a team of technically qualified individuals, and were scored as follows:

| | TRAX | Southwest Range |
|---|---|---|
| MISSION CAPABILITY | Blue/Outstanding | Blue/Outstanding |
| Management and Staffing | Blue/Outstanding | Blue/Outstanding |
| Continuity of Operations | Purple/Good | Blue/Outstanding |
| PAST PERFORMANCE | Substantial Confidence | Substantial Confidence |
| SMALL BUSINESS PARTICIPATION | Blue/Outstanding | Blue/Outstanding |
| COST/PRICE | $419,992,258 | $449,372,096 |

*Id.* The SSEB presented a summary of the evaluations and their recommendations to the Source Selection Authority ("SSA"). Tab 261 at AR 5055.

The SSA found SRS's proposal to be technically superior to TRAX's under Mission Capability (Factor 1) and awarded the contract to SRS at a price of $449,372,096. Final SSDD at AR 5141–42. While both offerors received overall ratings of "Outstanding" under Factor 1, the SSA concluded there was a meaningful distinction between the two proposals under this Factor. *Id.* at 5139. SRS received two significant strengths and four strengths under the Management and Staffing subfactor compared to TRAX's one significant strength and two strengths. *Id.* at AR 5139–40. Under the Continuity of Operations subfactor, SRS received three significant strengths while TRAX received two strengths and one weakness. *Id.* Because of these differences, the SSA concluded that SRS's proposal was technically superior under Mission Capability. *Id.*

The SSA found "no meaningful distinction" between the two proposals under both the Past Performance and Small Business Participation factors. *Id.* at AR 5141. While recognizing that TRAX's total evaluated Cost/Price was approximately 6.5% lower than SRS's, the SSA found SRS's technical superiority justified the price premium. *Id.* at AR 5141–42. The SSA separately reviewed a cost analysis of the three proposals by the Source Selection Authority Council ("SSAC"). Tab 385 at AR 7984. After reviewing the SSAC's comparative analysis in addition to the SSEB findings, the SSA determined SRS's proposal provided the best overall value to the government. Tab 387 at AR 7987. On February 9, 2026, TRAX was sent an unsuccessful offeror letter explaining it had not won the contract, along with debriefing slides and redacted versions of the Army's Source Selection Decision Document. Tab 392 at AR 8066–67.

**B. GAO Protest and OCI Investigation**

On February 17, 2026, TRAX filed a post-award bid protest with the Government Accountability Office ("GAO"). *See generally* Tab 320 ("GAO Protest"); Tabs 431–32 ("GAO Decision"). TRAX alleged the Agency had failed to identify and investigate SRS's potential organizational conflict of interest. GAO Decision at AR 9053–57. TRAX argued SRS's joint venture affiliates, including Electronic Warfare Associates ("EWA") and Sigma Defense ("Sigma"), produce items similar to those tested at WSMR.[2] *Id.* at AR 9054. TRAX asserted that SRS, if awarded the contract, would be testing systems, products, and technologies produced by those affiliates, rendering it incapable of providing impartial advice to the government. *Id.* at AR 9053.

In response to these allegations, the Agency initiated an investigation into the purported OCI on March 19, 2026. Def.'s MJAR at 32; *see generally* Tab 396 AR8121–249 ("OCI Investigation"). As part of that investigation, the Agency obtained declarations from Systems Application and Technologies Inc. ("SA-TECH"), the managing member of SRS, and EWA Warrior Services attesting that SRS had not tested or evaluated tools or products produced by Sigma, EWA, or any other EWA Warrior Services affiliate. Def.'s MJAR at 32–35. The declarants also represented that any SRS testing of products manufactured by these entities would fall outside the scope of WSMR's mission. *Id.* at 33.

Based on this evidence, Army Test and Evaluation Command ("ATEC") personnel concluded no product made by EWA or Sigma had ever been tested or evaluated at the White Sands Test Center ("WSTC"), and that such testing was unlikely to occur in the future. *Id.* Accordingly, the Agency determined TRAX's allegations regarding SRS's impartiality were unsubstantiated. *Id.* at 32. In its May 14, 2026, decision denying TRAX's protest, GAO concluded the Agency's investigation into the alleged OCI was reasonable given the Agency's data review and declarations asserting SRS had not and would not test products made by its affiliates. GAO Decision at AR 9057.

The GAO decision also addressed TRAX's objections regarding the Agency's assessment of Factor 1 (Mission Capability) and Factor 2 (Past Performance). *Id.* at AR 9057, 9062. GAO determined it did not have jurisdiction to consider TRAX's allegation that SRS lacks an adequate accounting system because it concerns the contractor's responsibility, not technical acceptability. *Id.* at AR 9052–53 n.1.

GAO concluded none of TRAX's allegations under Factor 1 were sufficient to sustain the protest. *Id.* at AR 9058. Under Factor 2, GAO found only granular differences between the two proposals on Past Performance and concluded the Agency reasonably found those differences inconsequential. *Id*. at AR 9061. To the extent the Agency improperly credited SRS for contracts performed by other joint ventures and its affiliates, TRAX could not demonstrate a reasonable possibility of prejudice. *Id*. GAO did not discuss whether any errors in the evaluation were the result of AI hallucinations. *See id.* at AR 9058.

---

[2] Sigma Defense acquired Electronic Warfare Associates ("EWA"), the immediate parent of EWA Warrior Services, in April 2024. SRS's MJAR at 3, 36. EWA Warrior Services is a minority member of the SRS Joint Venture. *Id.*

### C. Procedural History

TRAX filed the instant Complaint on May 29, 2026. *See generally* Compl. SRS moved to intervene as a Defendant on June 4, 2026. Mot. to Intervene, ECF No. 10. The Government submitted the AR on June 15, 2026, and TRAX filed a Motion to Complete the AR on June 22, 2026, which the Court addresses separately below.

TRAX filed its Motion for Judgment on the AR on June 30, 2026. Pl.'s MJAR. Defendant and Defendant-Intervenor cross-moved for judgment on the AR on July 9, 2026. Def.'s MJAR; SRS's MJAR. Briefing on the parties' cross-motions concluded on July 23, 2026. Pl.'s Resp. to Def. and SRS's Cross-Mots. J. on the AR ("Pl.'s Resp."), ECF No. 47; SRS's Reply Supp. Cross-Mot. J. on the AR ("SRS's Reply"), ECF No. 48; Def.'s Reply Supp. Cross-Mot. J. on the AR ("Def.'s Reply"), ECF No. 50. The parties submitted supplemental briefs on July 24, 2026. Pl.'s Suppl. Br., ECF No. 53; Def.'s Suppl. Br., ECF No. 52; SRS's Suppl. Br., ECF No. 51. The Court held a hearing on the motions on August 19, 2026. Currently pending are the parties' cross-motions for judgment on the AR.

## III. Motion to Complete the Administrative Record

Before turning to the parties' MJARs, the Court explains its decision to grant Plaintiff's Motion to Complete the AR. ECF No. 28. The Court will separately issue an Order to Show Cause requiring the Government to explain the errors and misrepresentations in its briefing on Plaintiff's Motion to Complete the AR. That matter will not be addressed in this Opinion.

### A. Legal Standard for Completing the Administrative Record

In resolving a motion to complete the AR, courts undertake the narrow task of determining which documents were "actually before the agency" during the evaluation process. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009); *Competitive Innovations, LLC v. United States*, 175 Fed. Cl. 296, 303 (2025). A motion to complete the AR seeks to add "information that was generated and considered by the agency" during the procurement but omitted from the record. *Smith v. United States*, 114 Fed. Cl. 691, 695 (2014), *aff'd*, 611 F. App'x 1000 (Fed. Cir. 2015).

Notwithstanding the conjunctive "generated and considered" language in *Smith*, this standard is commonly applied disjunctively. *Contrast Smith*, 114 Fed. Cl. at 695, *with Competitive Innovations*, 175 Fed. Cl. at 303 ("While an administrative record is typically presumed to be complete, the presumption of regularity may be rebutted by 'clear evidence of material that was *generated or considered* by the agency but excluded from the record.'" (emphasis added) (citation omitted)), *and Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019) (similar). Under either formulation of the standard, TRAX satisfied its burden as to all three AI evaluations.

### B. Motion to Complete: Procedural History

On June 16, 2026, the parties filed a Joint Letter notifying the Court of a dispute regarding the AR. Joint Letter to the Court ("Joint Letter"), ECF No. 27. Plaintiff was ordered to file the Letter as a Motion to Complete the AR, which it did on June 22, 2026. Mot. to Complete. In its Motion, Plaintiff asked the Court to order Defendant to submit documents

detailing the Army's use of FAST TRACK, an AI platform, during the evaluation process of the three proposals: [***] (Offeror A), TRAX (Offeror B), and SRS (Offeror C). *Id.* at 1.

The Government responded to Plaintiff's Motion to Complete on June 26, 2026, arguing the three AI outputs should not be included in the AR. *See generally* Def.'s Resp. to Mot. to Complete, ECF No. 32. Defendant stated the only AI output viewed by the SSEB was the report for Offeror A ([***]), and because none of the AI reports were deemed usable, they were never entered into the contract file or utilized in the decision-making process. *Id.* at 2–3. In support of its position, the Government filed two declarations: the first from [***], SSEB Chairperson for the WSMR Mission Support Services solicitation, and the second from [***], Procurement Analyst with Mission and Installation Contracting Command Headquarters, Theater Support Center. Def.'s Ex. A ("[***] Decl."), ECF No. 32-1; Def.'s Ex. B ("[***] Decl."), ECF No. 32-2.

In his declaration, Procurement Analyst [***] explained he was tasked with assessing the capability of FAST TRACK "to determine whether it could be used in future source selections." [***] Decl. ¶ 4; *accord* Gov't Resp. to Mot. to Complete at 2. As part of this assessment, Mr. [***] created AI outputs for all three offerors involved in the WSMR procurement. Mr. [***] subsequently displayed the AI output for [***] on a screen for the SSEB to view. [***] Decl. ¶ 5. The SSEB "did not receive digital or physical copies of [[***] output]." Gov't Resp. to Mot. to Complete at 2. After viewing the output, the SSEB concluded the document "[was] not useable and could not be used as a reliable tool." [***] Decl. ¶ 4.

On July 7, 2026, the Court granted TRAX's Motion to Complete as to Offeror A, as it was clear the SSEB had reviewed the [***] AI output. ECF No. 38. The Court could not, on the record then before it, determine whether the TRAX and SRS evaluations were reviewed by anyone involved in the procurement. To resolve that question, the Court ordered Mr. [***] and Mr. [***] to supplement their original declarations by answering the following questions:

> (1) What was Mr. [***] role with respect to the White Sands Missile Range Mission Support Services (WSMR MSS) procurement (Solicitation W51EW7-25-R-A003)? Did Mr. [***] have any decision-making authority over or decision-making role in this procurement?
>
> (2) Did Mr. [***] use FAST TRACK or any other AI tool to generate summaries or evaluations of the proposals for Offerors B and/or C?
>
> (3) Other than Mr. [***], did any individual with a decision-making role in this procurement view an AI-generated summary or evaluation of Offeror B's or Offeror C's proposal?

*See* Order Granting in Part Mot. to Complete.

The supplemental declarations were filed on July 9, 2026. Def.'s Ex. C ("Supp. [***] Decl."), ECF No. 41-3; Def.'s Ex. D ("Supp. [***] Decl."), ECF No. 41-4. On July 10, 2026, the Court granted the remainder of Plaintiff's Motion to Complete and ordered the Government to produce the AI evaluations of TRAX's and SRS's proposals and file all three AI evaluations with the Court as part of the AR. The parties were also directed to file supplemental briefs on the relevance and impact of the additional documents on Plaintiff's Complaint.

In his supplemental declaration, Mr. [***] acknowledged for the first time that he had shared the AI summaries with three individuals: [***], [***], and [***]. Supp. [***] Decl. ¶ 2. This belated admission is an issue the Court will address separately in a Show Cause Order. What is relevant for purposes of the Motion to Complete, is that two of the three individuals who received the FAST TRACK evaluations of TRAX's and SRS's proposals were SSEB members, [***] and [***], the Contracting Officer ("CO"). Tab 211 at AR 4011 (Source Selection Training Presentation identifying [***] as the Past Performance Chair and [***] as a Past Performance Member of the SSEB); Tab 263 at AR 5300 (Past Performance Evaluation Report signature block identifying [***] as WSMR MSS SSEB Chairperson and [***] as WSMR MSS SSEB Member).

### C. Discussion: The Three AI-Generated Evaluations Were Necessary to Complete the Administrative Record.

The AI evaluations are "relevant to the process" by which the Army made its decision, *see Oak Grove Techs., LLC v. United States*, 156 Fed. Cl. 594, 600 (2021) ("*Oak Grove I*"), because they "were generated specifically to reflect the comparative merits of the proposals received in response to the RFP." Pl.'s Reply in Support of Mot. to Complete at 3. They bear directly on the Army's evaluation process and on TRAX's claim that AI-assisted review introduced errors that infected its technical evaluation. *Id.* at 6.

It is likewise clear that the Army generated all three AI outputs during this procurement. The Government contends the AI output concerning [***] was generated only after that evaluation was finalized and thus fell outside the decision-making process. *See* Gov't Resp. to Motion to Complete at 2–3. Mr. [***] declaration states that "the output of the AI tool did not cause the SSEB to subsequently amend or change Offeror A's [([***])] evaluations." [***] Decl. ¶ 4. But had the SSEB found the AI output useful, it could have revised its evaluation. Indeed, the overlap between the AI evaluation for [***] and the SSEB's final evaluation suggests that it may have done just that. *See* Pl.'s Supp. Br. at 4–5. As for the TRAX and SRS evaluations, the Government does not contend, as it did for [***], that these were generated only after the corresponding SSEB evaluations had been finalized. The record therefore reflects that generation and review of the AI evaluations occurred during the agency's decision-making process.

Finally, Agency decision makers considered all three documents during the evaluation process. As to [***], the entire SSEB convened to review the FAST TRACK output for [***] proposal. [***] Decl. ¶ 4. Whether the SSEB ultimately found that output "useable" or "reliable" has no bearing on whether it was considered. *See id.*; *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168 (2011) ("[A]n agency may not exclude information merely on the grounds that it did not rely upon the excluded information when reaching a final decision when there was evidence that the information was, in fact, reviewed."); *Hager Dev. Grp., LLC v. United States*, No. 20-819, 2020 WL 4529817, at *4 (Fed. Cl. Aug. 5, 2020) (ordering inclusion of reports that were only "suggestions" for agency decision makers because they "add meaningful context" to the agency's decision).

As to TRAX and SRS, the Government's supplemental declarations confirm that, once generated, their evaluations were distributed to three individuals involved in the procurement, including the CO and members of the SSEB. Supp. [***] Decl. ¶ 2; Tab 211 at AR 4011. That

distribution is likewise sufficient to establish consideration for purposes of completing the record, regardless of whether the SSEB relied upon or used the outputs further.

Because all three documents were relevant to the Army's decision-making process, and because each was generated and considered by the Agency during the evaluation process, they should have been included in the AR. *See Westwind Partners, LLP v. United States*, No. 24-1504C, 2025 WL 985640, at *2 (Fed. Cl. Mar. 21, 2025) (explaining that the reviewing court must "have before it neither more nor less information than did the agency when it made its decision" (citation omitted)). Thus, the Court ordered the documents' inclusion in its July 10, 2026, Order.

With the record complete, it became apparent that the SSEB's evaluation of [***] contained multiple passages nearly identical, sentence for sentence, to the AI-generated evaluation of the proposal. Pl.'s Supp. Br. at 4–5 (comparing AR Tab 261 at 5059 with AR Tab 434 at 9089; AR Tab 261 at 5059 with AR Tab 434 at 9090). TRAX identified this in supplemental briefing and at oral argument to support its position that overreliance on AI tainted the technical-evaluation process. Pl.'s Suppl. Br. at 2. Specifically, TRAX argues "the weakness that the Army erroneously assigned to TRAX, and two of the SRS strengths that TRAX challenges in this protest, have analogs in the AI evaluations." *Id.* (citation modified).

But any substantive or textual overlap in TRAX's and SRS's evaluations is minimal. While the Court cannot entirely rule out the use of AI in assessing the proposals, more is needed to support TRAX's argument that the SSEB over-relied on AI such that the entire evaluation became arbitrary and capricious. TRAX rests its argument on broad assertions that the AI evaluations and the SSEB evaluations reach similar outcomes on some factors. *See* Pl.'s Suppl. Br. at 2; *see, e.g.*, SRS's Suppl. Br. at 5 (explaining that although both the SSEB and the AI output reference SRS's "[***]" organizational structure, this is unsurprising given SRS's repeated use of that description in its proposal). But TRAX identifies no actual errors or inaccuracies in the challenged evaluation findings that it can trace to AI. Even if the Court were to find AI was relied upon in some way, TRAX has not demonstrated why that reliance independently undermines the validity of the Army's findings. As SRS states, "TRAX has not explained what remedy or instruction TRAX seeks from this Court related to the Army's use of AI." SRS's Suppl. Br. at 7. Without more, TRAX's request that the Court consider "[the] use of AI in determining what, if any, deference the Army's findings deserve" is unavailing. Pl.'s Suppl. Br. at 4.

## IV. Legal Standard for Bid Protests

### A. Bid Protests

The U.S. Court of Federal Claims reviews an agency's contract award under the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(1), (4). The Court determines whether the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

A bid award may be set aside if either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (citation omitted). To

find a rational basis, the Court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1381 (citation omitted). To establish a procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (citation omitted). "*De minimis* errors in the procurement process do not justify relief." *Off. Design Grp.*, 951 F.3d at 1374 (citation omitted).

"Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). But an "explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernible." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021) (quoting *Wheatland Tube Co.*, 161 F.3d at 1369–70).

"Generally speaking, an agency must evaluate an offeror's proposal based on the criteria set out in the solicitation." *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 383 (2017). At the same time, "an agency still enjoys 'great discretion in determining the scope of an evaluation factor.'" *Id.* (quoting *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). "[W]hen weighing the merits of a proposal under a specific evaluation factor, an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor." *Id.* (citation modified) (quoting *Forestry Survs. & Data*, 44 Fed. Cl. at 497).

In addition to establishing agency error under the APA, a disappointed bidder must demonstrate that it was significantly prejudiced by that error. *Bannum, Inc.*, 404 F.3d at 1351. A bidder is significantly prejudiced if "there was a substantial chance it would have received the contract award but for" the agency's errors. *Id.* at 1353 (citation modified). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).

Finally, while this Court is not bound by GAO's ruling in a post-award bid protest, the Court typically "gives due weight and deference to GAO recommendations given the GAO's long experience and special expertise in bid protest matters." *CMS Cont. Mgmt. Servs. v. Mass. Hous. Fin. Agency*, 745 F.3d 1379, 1384 (Fed. Cir. 2014) (citation modified); *see, e.g.*, *Concourse Grp., LLC v. United States*, 131 Fed. Cl. 481, 488 n.3 (2017).

### B. Cross-Motions for Judgment on the Administrative Record

Bid protests pursuant to 28 U.S.C. § 1491(b) are resolved via motions for judgment on the AR, Rule of the Court of Federal Claims ("RCFC") 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc.*, 404 F.3d at 1356. The process is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Id.* In deciding cross-MJARs, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)).

## V. Discussion

**A. The Army Did Not Err in Finding SRS Eligible for Award.**

TRAX claims SRS should have been ineligible for award because it lacks an accounting system that meets the requirements of Section L.7.1 of the RFP. Pl.'s MJAR at 9–11. The Government responds that the accounting-system provision in Section L is not an evaluation criterion upon which the award could be based, rendering this a contract administration claim that falls outside the Court's jurisdiction. Def.'s MJAR at 31; Def.'s Reply at 4.

As explained below, this issue was properly before the Court, and the Army did not act arbitrarily or capriciously in making the award to SRS notwithstanding the absence of its own approved accounting system.

**1. The Court Has Jurisdiction to Consider TRAX's Adequate Accounting Claim.**

The Tucker Act grants this Court jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Matters of contract administration and contract performance, however, fall outside that grant and must instead be pursued under the Contract Disputes Act. *See Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 992 (Fed. Cir. 2018); *Relyant Glob., LLC v. United States*, 146 Fed. Cl. 817, 823 (2020). Whether a claim challenges the award decision itself, as opposed to the Government's administration of a contract already awarded, requires the court to look past labels to the substance of the relief sought. *See Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344–46 (Fed. Cir. 2008).

The Government's threshold argument cites *Relyant* for the proposition that TRAX's accounting-system challenge is a contract administration claim outside this Court's jurisdiction. Def.'s MJAR at 31. But *Relyant* turned on the timing of when, during contract performance, an awardee needed to obtain a security clearance as required by the solicitation. 146 Fed. Cl. at 822–24 (finding the protestor's principal objection was that the Army allowed the awardee to begin mobilization activities before the awardee secured a facility security clearance). TRAX's claim, by contrast, concerns whether the accounting-system provision was a material requirement of award in the first instance. *See* Pl.'s Resp. at 2–7.

Both the Court of Federal Claims and the Federal Circuit have consistently treated similar requirements as going to the technical acceptability of the awardee's proposal, not to jurisdiction. *See, e.g.*, *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1380 (Fed. Cir. 2024) ("*Oak Grove II*") (evaluating whether a Section L requirement was material, and therefore whether an offeror's failure to submit under it rendered the proposal unawardable); *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 382–83 (2003) (resolving the materiality of an RFP provision on judgment on the AR), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). TRAX's central claim is that the Army should never have awarded the contract to SRS, because at the time of submission, SRS's proposal failed to satisfy what TRAX contends is a material requirement of the RFP. Whether an RFP provision functions as a material eligibility criterion is a question about the propriety of the award decision and so falls within Section 1491(b)(1). *See Oak Grove II*, 116 F.4th at 1380.

### 2. The Accounting-System Requirement Was Not a Mandatory Minimum or Material Requirement that Could Serve as a Bar to Award.

An agency may not award a contract to an offeror whose proposal fails to conform to a material term of the solicitation. *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011). A requirement is "material" where it (1) is express in the solicitation and (2) serves a "substantive purpose," meaning it is important to the agency's evaluation, binding on the offeror, or has more than a negligible effect on price, quantity, or quality. *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020). A "mandatory minimum" requirement is a type of material requirement, the violation of which leads to outright rejection of a proposal, rather than a mere reduction in score. *Id.*; *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002). A mandatory minimum requirement must be clearly identified as such within the solicitation to "put offerors on notice" of the serious consequences of failing to meet the requirement. *Isratex, Inc. v. United States,* 25 Cl. Ct. 223, 229 (1992). Whether a given RFP provision rises to a mandatory minimum requires interpreting the solicitation as a whole and giving effect to the plain language of every provision. *See Banknote*, 56 Fed. Cl. at 383.

TRAX argues the RFP "clearly identified an adequate accounting system as a mandatory minimum and material requirement for the award," and that because SRS lacks "any accounting system, let alone one that has been deemed adequate in accordance with the FAR and the RFP," SRS is ineligible for award. Pl.'s MJAR at 9–11. The record indicates SRS's accounting system was in the process of being audited by the Defense Contract Audit Agency ("DCAA"). Tab 217 at AR 4139. Pending that determination, the Army determined it could rely on the accounting system of SRS's joint-venture member, SA-TECH. Tab 195 at AR 3592–93. TRAX counters that SA-TECH's accounting system is approved for SA-TECH's use only, and SRS's consequent lack of an approved system is disqualifying. Pl.'s MJAR at 11.

TRAX grounds this argument in Section L.7.1 of the RFP, which requires offerors to "provide evidence to support that it has an adequate accounting system." Pl.'s MJAR at 8–9 (citing Tab 132 at AR 2411). TRAX reads this requirement in conjunction with a separate provision that states "[f]ailure to provide a proposal in compliance with the instructions specified in this RFP shall render the Offeror's proposal non-compliant, resulting in the Offeror no longer being eligible or considered for award." *Id.* (citing Tab 132 at AR 2401). Together, TRAX argues, these provisions made an adequate accounting system a mandatory minimum and material requirement for contract award. *Id.*

The Government responds that nothing in L.7.1 requires the Army to assess accounting system adequacy prior to award, and Section L merely outlines "information and instructions" governing proposal preparation, while Section M delineates material evaluation criteria. Def.'s Reply at 4–5; *see* Tab 122 at AR 2142 (identifying Section M.1 as "Basis for Contract Award"); Tab 132 at AR 2400 (identifying Section L.1 as "Information to Offerors and Instructions for Proposal Preparation"). Critically, the Government notes TRAX identifies no Section M provision addressing any accounting-system requirement, let alone one tying a deficient accounting system to disqualification. Def.'s Reply at 4.

TRAX relies on *DigiFlight* for the proposition that an express requirement serving a substantive purpose is material. Pl.'s Resp. at 3 (citing 150 Fed. Cl. at 657). But the provision at issue in *DigiFlight* was more consequential than the Section L provision at issue here. There, the

Section L requirement that offerors justify any profit above a set threshold was repeated in Section M and expressly tied to award eligibility. *DigiFlight*, 150 Fed. Cl. at 658. The solicitation warned noncompliance with the provision "will result in a determination that Profit is not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score." *Id.* Section M further provided that any proposal failing to comply with the instructions in Sections J, K, or L could be removed from consideration without further evaluation. *Id.* at 653. The Court found the Solicitation "clear and unambiguous" that the profit-rationale provision was material. *Id.* at 657.

Comparable provisions are absent here. Def.'s Reply at 5. The WSMR RFP's Section M is silent on accounting-system adequacy. And the general provision TRAX invokes—that noncompliance with "the instructions specified in this RFP" renders a proposal ineligible—is far less specific than the relevant *DigiFlight* language. *See* Pl.'s MJAR at 8. Unlike a provision singling out one requirement as outcome-determinative, a catch-all compliance clause does not render every section in a Solicitation material.

TRAX's reliance on *FreeAlliance.com* is also unpersuasive. There, the protestor was excluded from further consideration for failing to comply with a Section L requirement to submit verification of an adequate accounting system. *FreeAlliance.com, LLC v. United States*, 135 Fed. Cl. 71, 73 (2017). That requirement was an explicit "go/no-go" evaluation criterion applied as a disqualifying, separate screening step to every offeror. *Id.* at 74. Further, the Agency rejected the protestor's proposal "[i]n accordance with section M.2.a(2)"—a section M provision. *Id.* at 76. The Court ultimately held the agency had not abused its discretion because it treated all offerors equally, that is, applied the same accounting-system criterion to every offeror. *Id.* at 80 ("None of the offerors with noncompliant features in their proposals that FreeAlliance relies on proceeded to phase two evaluation."). TRAX does not allege disparate treatment here, and, as the Government points out, "there is no evidence that the Army would have excluded TRAX – but not SRS – had both not met the administrative requirements of section L.7.1." Gov't Reply at 9 n.7. Because *FreeAlliance.com* turned on equal treatment, its holding offers TRAX little support.

By contrast, *Oak Grove II* provides a closer parallel to the instant facts. 116 F.4th at 1379. There, the Federal Circuit held that an agency did not act arbitrarily or capriciously in finding a proposal acceptable despite its omission of a sample teaming agreement because the teaming agreement provision was not a material requirement. *Id.* Relying on the agency's statement that "[t]here is no Section M [evaluation criteria] or evaluation for admin volume," the court reasoned:

> [T]he Solicitation directs the offerors to include teaming agreements in the administrative volume, which is a portion of the proposal that is not evaluated as part of the bid evaluation process. This seems to reflect the Army's anticipation that failing to show the agency any current teaming agreements the offeror is party to would have a negligible impact or effect on price, quantity, quality, or delivery.

*Id.*

The same logic controls here. Section L.7.1's accounting-system requirement, similar to the teaming agreement provision in *Oak Grove II*, appears without mandatory-minimum language or any corresponding Section M evaluation criteria, a signal that the Army did not

intend the requirement to carry a material effect on award. *See id.*; *see also Banknote Corp.*, 56 Fed. Cl. at 383. Accordingly, the Army's treatment of Section L.7.1 of the WSMR RFP as informational was not unreasonable.

The record also shows that SRS was transparent about its accounting-system status. Tab 195 at AR 3820–21 (explaining in the Standard Form 1408 that "[i]n the unlikely event that DCAA's post-award audit of SRS's accounting system is not completed by contract award, SRS will use SA-TECH's approved accounting system in execution of the follow-on contract"). The Army evaluated each offeror's accounting system, recognized SRS's system was undergoing an audit, and explicitly determined SRS could rely on its JV-member's system. Tab 261 at AR 5100. That decision falls within the CO's discretion. *See* Defense Federal Acquisition Regulation Supplement ("DFARS") 48 C.F.R. § 242.7502(b) ("The cognizant contracting officer . . . shall—(1) Determine the acceptability of a contractor's accounting system and approve or disapprove the system; and (2) Pursue correction of any weaknesses or deficiencies."). Because the WSMR RFP did not identify accounting-system adequacy as a mandatory minimum requirement or Section M evaluation criterion, and because the CO found SRS's JV-member's system sufficient, the Army's determination that SRS remained eligible for award was not arbitrary or capricious.

**B. The Army Reasonably Assigned SRS Strengths Under the Factor 1 Subfactors.**

"All evaluation criteria other than Cost, when combined, were significantly more important than the Cost/Price factor," which the Solicitation noted, "may result in an award to [an Offeror] other than the lowest price Offeror." Def.'s MJAR at 4 (quoting Final SSDD at AR 2142). TRAX argues the Army acted arbitrarily and capriciously when it gave SRS the following strengths: (1) a significant strength under Subfactor 1B for proposing use of the Project Cost Management System ("PCMS"); (2) a significant strength under Subfactor 1A for its teaming and management structure; and (3) a strength under Subfactor 1A for SRS's proposed use of "visionary tools."[3] Pl.'s MJAR at 12–19. TRAX alleges the Army's assignment of these strengths to SRS bore "no rational connection to the record, but . . . contributed to SRS's false appearance of technical superiority." Pl.'s Resp. at 1; *see also* Compl. ¶¶ 56–124.

TRAX is incorrect as to each claim.

**1. The Assignment of a Significant Strength for Proposing PCMS Was Reasonable.**

First, TRAX argues SRS should not have received a significant strength under Subfactor 1B for proposing use of the PCMS system because "given that the Government owns and provides PCMS, and that PCMS runs on Government-owned and -provided hardware, it makes

[3] "The Army conceded at GAO that the weakness for proposing to mirror WSMR's organizational structure as the approach to realignment of incumbent personnel assigned to TRAX under Subfactor 1B was improper." Pl.'s MJAR at 12 (citation modified). But the GAO decision noted that the SSA's "determination that [SRS's] proposal was superior under the Mission Capability factor does not discuss this weakness at all." GAO Decision at AR 9061. Accordingly, GAO found no prejudice because of this error. *Id.* The Court agrees.

no sense to suggest that anyone other than SRS could not 'preserve' PCMS or that it would require 'months' to migrate or adopt PCMS." Pl.'s MJAR at 14 (citation modified).

In contrast, the SSA's explanation of this significant strength is as follows:

> [SRS] demonstrated a superior approach to realignment of incumbent personnel potentially minimizing interruption of services to reduce risk of impact to the overall mission which includes; leveraging integrated digital systems such as the Project Cost Management System (PCMS) which is utilized for all work orders under this effort, costing, and maintenance tracking; centralized Standard Operating Procedures (SOP) libraries, and Cornerstone (the system SRS utilizes for all training), earning this Offeror a Significant Strength. This reduces the need for system migrations or process adoptions that could take months to implement and complete. PCMS drives the activity that occurs on the range. The preservation of the system and the incumbent personnel familiar with it are essential in capturing efficiencies of uninterrupted execution of mission-critical functions.

Final SSDD at AR 5131.

GAO found the Army assigned the significant strength not, as TRAX alleges, for proposing to use the PCMS, "but rather for how [SRS] proposed to use knowledge management tools to maintain uninterrupted performance by incumbent personnel." Tab 431 ("GAO Decision") at AR 9061. GAO reasoned the assignment of a significant strength was consistent with the RFP's personnel-realignment criteria that emphasized "minimiz[ing] interruption of services or delays in work progress that could potentially impact the overall mission." *Id.*

TRAX bases much of its argument on the fact that the Army owns the PCMS and "the contractor simply maintains it and develops workflows within it." Pl.'s Resp. at 12. But TRAX has not shown the SSA was unreasonable in concluding that SRS's PCMS approach would add significant value to contract performance. While PCMS is indeed a government-owned system, the Performance Work Statement ("PWS") permits customization unique to the awardee's operational approach. Tab 126 at AR 2197. SRS made clear in its proposal that it "tailored the PCMS specifically and uniquely for WSMR." Tab 183 at AR 3294.

The significant strength thus reflects "an assessment of the benefit to the Army of continuing to use SRS's approach to tracking work orders, costing, and maintenance, and not merely an assessment of SRS's willingness to keep using the Microsoft software products the Army provides and requires." Def.'s MJAR at 24 (citing Tab 387 AR 8015; Tab 412 AR 8514–16); *see also* SRS's MJAR at 19–21 (arguing that "[e]ven if the Army could hand the entire PCMS, including the SRS-developed elements, to TRAX on the first day of the contract, TRAX lacks familiarity with the SRS-developed PCMS, and TRAX's personnel do not use the SRS-developed PCMS").

TRAX has not sufficiently rebutted the Army's articulated reasoning, and this Court cannot "substitute its judgment for that of the agency." *J.C.N. Const., Inc. v. United States*, 107 Fed. Cl. 503, 515 (2012) (citation omitted). Because the SSA found that SRS's tailor-made PCMS workflows would provide value to the Agency, the Court defers to that judgment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (finding agency decisions should be upheld when "the agency's path may reasonably be discerned"); *see*

*also Ultra Elecs. Ocean Sys. Inc. v. United States*, 139 Fed. Cl. 517, 530 (2018) (holding an agency has discretion "to determine compliance with the technical requirements" of a project).

Nor was this strength a "double counting" because SRS separately received a significant strength for "a 100% retention of current incumbent personnel." Pl.'s MJAR at 14; *see also* Pl.'s Resp. at 13. As Defendant-Intervenor notes, "[t]he Army awarded significant strengths to SRS for two separate advantages." SRS's MJAR at 20. While the retention strength focused on SRS's "proactive recruitment and retention plan," the PCMS strength "recognized the value of continuity of experience held by the SRS staff with the valuable SRS-designed PCMS." *Id.* (citing Final SSDD at AR 5130–31).

Because the Army acted reasonably in awarding this strength to SRS, TRAX's claim on this point fails. *See J.C.N. Const., Inc.*, 107 Fed. Cl. at 515 (citation omitted).

**2. The Assignment of a Significant Strength for SRS's Teaming and Management Structure Was Reasonable.**

Next, TRAX alleges the Army improperly assigned SRS a significant strength under Subfactor 1A for proposing a teaming and management structure that would "potentially lead to more efficient decision making due to the minimal and streamlined layers of management one needs to request/route work approval through." Final SSDD at AR 5130. The Agency further found SRS's structure would "result in streamlined mission performance and minimal work delays, reducing risk for the Government." *Id.*

TRAX responds that its own Program Management Office ("PMO") was smaller and more efficient than SRS's. Pl.'s MJAR at 16 n.3. TRAX also points out that its proposed project manager ("PM") and deputy manager ("DPM") had "full authority to act for the Contractor on all contract matters relating to daily operations of this contract." Tab 126 at AR 2185; Pl.'s MJAR at 17–18. In its view, it therefore does not hold that TRAX proposed "an additional management layer when the DPM has full authority." Pl's MJAR at 17 (citation modified).

But it is within the Agency's discretion to decide which structure will "potentially lead to more efficient decision-making." Final SSDD at AR 5130. TRAX may believe its smaller team would outperform SRS's, but the Agency is not required to share that view. Such judgments go to "the minutiae of the procurement process . . . that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citation modified).

GAO reached the same conclusion, explaining that "the agency's evaluative judgment concerned not the size of a given offeror's program management office, but rather the simplification and streamlining of decision making enabled by Southwest Range's proposed organizational structure." GAO Decision at AR 9059–60 (citation modified).

Additionally, the two proposals were not "substantively indistinguishable or nearly identical," as a disparate treatment claim requires. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citation modified); *see, e.g.*, *Massman Constr. Co. v. United States*, No. 25-2158, 2026 WL 1971985 at *9–11 (Fed. Cl. July 7, 2026). Both TRAX and SRS used organizational flowcharts, but SRS's was cleaner, with direct lines of authority clearly marked:

[***]

Tab 183 at AR 3283 (SRS's Proposal); Tab 146 at AR 2664 (TRAX's Proposal).

At oral argument, TRAX stressed that SRS received a strength not for having a user-friendly chart, but for having fewer managers. But this is an oversimplification of the Army's findings. Instead, the Agency compared the supervisory lines depicted in the offerors' charts and concluded SRS's structure reduced the number of layers through which an approval had to pass. Final SSDD at AR 5130. GAO agreed:

> A comparison of the organizational charts contained in the offerors' proposals, for example, demonstrates that the protester's proposal was not substantively indistinguishable from, or nearly identical to, [SRS's] proposal in that regard. [SRS's] organization chart shows that all of the departments responsible for the substantive requirements of the contract report directly to the program manager. . . . By contrast, the protester's organizational chart shows several such departments reporting first to the deputy program manager and then to the program manager. The protester's proposed organizational structure thus interposes an additional management layer not present in Southwest Range's proposal.

GAO Decision at AR 9058–59 (citation modified).

TRAX disputes this characterization, but it has not shown that its structure would objectively be more efficient. If some departments report to the PM while others report to the DPM—even though both officials have full authority to act for TRAX on daily operational matters—the Agency could reasonably conclude that the split reporting lines create inefficiencies. That determination is a judgment call within the Agency's discretion. *See E.W. Bliss Co.*, 77 F.3d at 449.

"It is well-established that the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Dynamic Sys. Tech., Inc. v. United States*, 127 Fed. Cl. 551, 560 (2016) (citation modified). The Agency's assigned organizational strength to SRS is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle*, 463 U.S. at 43).

Accordingly, TRAX's protest to the Army's assignment of this strength also fails.

**3. The Army's Assignment of a Strength for SRS's Use of "Visionary Tools" was Consistent with the Evaluation Criteria.**

Finally, TRAX alleges the Army improperly assigned SRS a strength for using "visionary tools" under Subfactor 1A to assist with staffing capacity. The Agency found:

> The Offeror proposed a detailed description of visionary tools for proactive strategy leveraging innovative technologies, specifically [***] capabilities, to support PWS Part 5, earning this Offeror a Strength. This benefits the Government by capturing efficiencies to assist the workforce in doing more with less.

Final SSDD at AR 5130.

In its proposal, SRS described how it would "leverage[] a combination of skilled personnel, proven processes, advanced tools and technology, and a robust organizational and management structure." Tab 183 at AR 3304. These "advanced tools and technologies" include SRS's proposed [***] capability. *Id.* at AR 3277.

According to TRAX, the RFP's evaluation criteria did not mention "visionary tools" and the RFP provisions cited by the SSA "[did] not indicate that the use of new technologies was a consideration." Pl.'s MJAR at 18. In its view, the SSA violated "black letter law" forbidding reliance on unstated evaluation criteria. *Id.* (citing *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650–53 (2014)). However, the Solicitation asked offerors to "describe [their] ability to react to surge requirements and how it intends to staff the requirement with specialized personnel on short notice" and "detail [their] approach in staffing fluid requirements, where workload demands increase/decrease unpredictably." Tab 132 at AR 2406. "The ability to react to surge requirements, with the technology cited by SRS is squarely within the wheelhouse of this requirement." Def.'s MJAR at 21 (citation modified); *see also* SRS's MJAR at 24–25.

"A solicitation need not identify every possible consideration under each stated evaluation factor, provided the matters the agency considers are reasonably related to, or encompassed by, the stated criteria." *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 784 (2011) (citation omitted). Here, the proposed use of "visionary tools" like AR-RE capability is reasonably related to absorbing surge and fluctuating workload requirements, which may require "doing more with less." Final SSDD at AR 5130. And an "explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernible." *DynCorp Int'l*, 10 F.4th at 1315 (citation omitted).

The Army's assignment of this strength is therefore valid.

**C. Even if the Army's Past Performance Evaluation Was Not Reasonable, TRAX Cannot Show Prejudice.**

TRAX alleges the Army's Past Performance evaluation was arbitrary and capricious and improperly credited SRS for three contract references from entities that will not contribute to the Contract at issue. Pl.'s MJAR at 20–23. According to TRAX, the Army "would have credited TRAX's consistently 'Excellent' ratings as presenting an advantage over SRS's 'Very Good' to 'Excellent' ratings and would not have elected to pay the $29.4 million price premium associated with SRS's proposal." *Id.* at 26.

Where a solicitation does not address or prohibit submission of affiliate references, an agency "may consider the experience or past performance of subcontractors or affiliates of an offeror, so long as the offeror explains how the subcontractors or affiliates will be used to perform the work." *Noblis MSD, LLC v. United States*, 180 Fed. Cl. 667, 700 (2026); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 747 (2008) (requiring an offeror in this context to demonstrate "that the resources of the parent or affiliated company will affect the performance of the offeror").

SRS argues that each of the three challenged contracts "are tied to SRS through the participation of SRS JV members SA-TECH and Amentum." SRS's MJAR at 28. The Final SSDD recognized this when describing these references. *See* Final SSDD at AR 5132 (describing the second Past Performance reference submitted under a joint venture "between Amentum and lnDyne, with SA-TECH as a major subcontractor"); *id.* (describing the third Past Performance reference submitted under "a wholly owned subsidiary of Amentum"); *id.* at 5133 (describing the fourth Past Performance reference submitted under a joint venture between "EWA and SA-TECH").

According to Defendant-Intervenor, its proposal "identifies multiple ways in which both SA-TECH and Amentum will provide systems, resources, equipment, and other support for the proposed [Contract]," including the involvement of key personnel. SRS's MJAR at 28–29; *see, e.g.*, *id.* ("[***]"). TRAX disagrees, arguing none of the information provided demonstrates "meaningful involvement" by SA-TECH or Ammentum. Pl.'s Resp. at 20 (quoting *Noblis MSD*, 180 Fed. Cl. at 705).

"Agency past performance evaluations are entitled to the greatest deference possible." *Alisud - Gesac Handling - Servisair 2 Scarl v. United States*, 161 Fed. Cl. 655, 668 (2022) (citation modified); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909–10 (Fed. Cir. 2013) (agencies have "broad discretion" to measure and evaluate an offeror's past performance). Given this high level of deference and the information available in the record, TRAX has not met its burden to demonstrate error. The Final SSDD did not, as the agency did in *Noblis*, "repeatedly and consistently . . . fail to distinguish between [the offeror] and [its affiliate]." 180 Fed. Cl. at 703. Nor are SA-TECH and Amentum "barred from any [SRS] operations," and thus they "would not be involved with the work [SRS] is to complete under the [Contract]." *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 554–55 (2025).

However, even assuming TRAX has met its burden, the Court finds TRAX has not demonstrated prejudice because it is simply too speculative that the alleged error would have had an impact on the SSA's best-value tradeoff analysis. *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 703 (2014). Even without the challenged references, it is highly likely that SRS would have still received a "Substantial Confidence" rating given that SRS (1) is currently performing the incumbent work to positive ratings, and (2) received twenty-four "Exceptional" and "Very Good" ratings out of twenty-eight ratings across its five years of incumbent performance. SRS's MJAR at 31–33.

TRAX argues that "even if SRS retained its 'Substantial Confidence' rating, there are meaningful distinctions between TRAX and SRS that were ignored in the prior award decision that would have to be considered in a new one." Pl.'s Resp. at 23 (citation modified). But considering all the "surrounding circumstances," the minor differences between the two offerors on Past Performance would not give TRAX a "substantial chance" to receive the Contract. *Alfa*

*Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999); *see* Def.'s Reply at 13 ("[TRAX's and SRS's past performance] ratings are based on both parties having strong performance on ratings on contracts that are substantively (in TRAX's case), or actually (in SRS's case, as the incumbent) identical to this contract.").

Because TRAX has failed on all its arguments protesting the Factor 1 and Factor 2 ratings, the Court grants Defendant's and Defendant-Intervenor's MJARs as to these claims.

**D. The Army's OCI Investigation Was Not Unreasonable.**

TRAX argues the Army failed to conduct a proper OCI investigation of SRS; its objections lack credence.

This Court has jurisdiction to review claims of potential OCIs and determine whether an agency's decisions in connection with a procurement were arbitrary or capricious. 28 U.S.C. § 1491; *see Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 327–28 (2018). "[T]he FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1381–82 (citing FAR 9.505). The Court reviews such determinations under an arbitrary and capricious standard rather than *de novo*. *Id.* at 1382.

An OCI exists when, "because of activities or relationships with other persons or organizations, a person [or organization] is unable, or potentially unable, to render impartial assistance or advice to the government." FAR 2.101 (citation modified). Contracting Officers bear responsibility for identifying and analyzing potential conflicts. FAR 9.504(a)(1). The CO may conduct a post-award OCI investigation to determine either that "no significant OCI existed" or that "the potential OCI was properly mitigated." *Bowhead Enter., Sci. & Tech., LLC v. United States*, 179 Fed. Cl. 1, 13 (2025).

This Court has recognized the potential for an impaired objectivity OCI where a company may be called upon to evaluate the work it has performed under another contract, or where a contractor is asked to analyze and recommend products manufactured by itself, its subcontractors, or its competitors. *See Aegis Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016); *Bowhead*, 179 Fed. Cl. at 12–13. The burden falls on the protestor to prove that such a conflict exists by identifying "specific facts" showing the contractor has "unequal access to information." *Ala. Aircraft Indus., Inc. v. United States*, 83 Fed. Cl. 666, 690 (2008) (citation omitted), *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009). Put differently, a protester must show "hard facts" that the contractor is unable to be impartial, either because it is evaluating its own work or the work of a subcontractor or competitor. *Aegis Techs. Grp.*, 128 Fed. Cl. at 572–75. This showing may be made by demonstrating that the contractor had "access to the kind of specific, sensitive information that would create an OCI." *Ala. Aircraft*, 83 Fed. Cl. at 688 (citation omitted).

TRAX alleges the Army did not meaningfully consider whether SRS has an unmitigable impaired objectivity OCI because SRS would be required to test systems, products, and technologies produced by its own affiliates, including SA-TECH, Amentum Services, Inc., and EWA Warrior Services. Pl.'s MJAR at 26–28. In its GAO protest, TRAX identified several systems produced by affiliated entities of the SRS Joint Venture that are allegedly subject to testing at WSMR: countermeasures pedestals, radio frequency jammers, Stingray Tactical Relay

System, and Recon V OverWatch systems. GAO Decision at AR 9054–55. The Army responded that it conducted a thorough investigation into TRAX's OCI allegations and reasonably concluded that SRS did not have an impaired objectivity OCI. *See generally* OCI Investigation. GAO agreed, finding the Army's investigation was not clearly unreasonable. GAO Decision at AR 9057. Although TRAX continues to argue that the Army's investigation was incomplete and unreasonable, Pl.'s MJAR at 26–28, TRAX does not point to any record evidence suggesting the Army's OCI investigation was incomplete or that the Army's conclusions were arbitrary, capricious, or contrary to the evidence.

As part of its investigation, the Army obtained declarations from corporate officers of EWA Warrior Services and SA-TECH. OCI Investigation at 8149–52. The officers stated that SRS had not evaluated equipment produced by SRS, nor had it tested or evaluated tools or products produced by Sigma, EWA, or any other EWA Warrior Services affiliate under the current contract. *Id.* at AR 8150, 8152. The EWA Warrior Services officer further noted that the systems TRAX identified as posing a potential OCI are not weapons systems—the focus of testing at the WSTC—but rather intelligence, surveillance, and reconnaissance or detection tools. *Id.* at 8152.

The Army also obtained data identifying products that EWA Warrior Services, EWA Government Systems, and Sigma Defense delivered to Department of Defense ("DoD") customers since April 2024. *Id.* at 8127–28. WSMR personnel reviewed the data and found no evidence that SRS was responsible for testing, validating, or fielding a system purchase from EWA or Sigma Defense. *Id.* at 8131. TRAX argues the data "does not reflect EWA products already integrated into a weapon system delivered to WSMR." Pl.'s MJAR at 27. But the burden rests on TRAX to identify what those integrated products might be, and as TRAX conceded at oral argument, it has not done so. *See Ala. Aircraft*, 83 Fed. Cl. at 690. TRAX also does not reallege the products it identified before GAO continue to represent conflicts of interest for the Agency. *See* GAO Decision at AR 9055.

TRAX further contends that the data reviewed as part of the CO's investigation fails to show "that the WSMR MSS contractor does not purchase all systems tested at WSMR." Pl.'s Resp. at 21. But the Agency "did not limit its investigation to purchases that the WSMR MSS contractor (*i.e.*, SA-TECH under the incumbent contract) made." SRS's Reply at 14 n.1. Instead, the Agency reviewed "a complete list of all equipment/tools/parts SRS and separately, SA-Tech, has delivered under DoD contracts since April 2024, when the Sigma Defense acquisition of EWA was completed." OCI Investigation at AR 8154 (citation modified). This data review, while time-bound, was comprehensive.

TRAX also alleges that in conducting its investigation, "the Army did not ask whether EWA, Sigma Defense, or any other SRS affiliate develops or produces components, parts, subsystems, or software that are integrated into weapon systems that are tested at WSMR." Pl.'s Resp. at 21. As the Government explained at oral argument, TRAX's request that the Army examine every weapon system at the component level would be an arduous undertaking. The Army's review was more limited, but it did investigate the specific components that TRAX identified as potentially problematic before GAO. For example, the Army received a declaration from the EWA president that the components TRAX identified "are not directly or indirectly tested or evaluated at WSMR under the incumbent contract and will not be evaluated under the solicited effort." Def.'s Reply at 14 (citing OCI Investigation at AR 8151–52, 8241–49).

TRAX further argues the declarations on which the Agency relied were not credible, and that the Agency knew as much yet relied on them anyway. Pl.'s MJAR at 28. TRAX is correct that the investigation findings note similarities among the declarants' statements that "bring into question the credibility of each Declaration." OCI Investigation at AR 8132–33. But the report goes on to explain that [***] provided "more substantive detail to refute the OCI allegations." *Id.* WSMR personnel corroborated the information in his declaration. *Id.* The Army thus weighed the strengths and weaknesses of the declarations before it reached a final determination, accounting for the overlap TRAX now identifies. *Id.* And as SRS points out, the overlap could reasonably be explained by outside counsel's involvement in helping prepare the declarations. SRS's MJAR at 38. Ultimately, the Army concluded the declarations were sufficiently credible due to material differences between them and corroborating statements from WSMR personnel. OCI Investigation at AR 8133.

It was reasonable for the Agency to focus its investigation on the incumbent contract, since "the best indication of tasks SRS will perform under this contract are the tasks SRS performed under the incumbent contract for the same services." SRS's MJAR at 36 (citing OCI Investigation at AR 8124). Based on sworn declarations, supporting data, and consultation with Agency personnel, the CO concluded "no items supplied by [EWA or Sigma Defense] have eve[r] been subject to certification, operational, or developmental testing at WSTC, WSMR." OCI Investigation at AR 8132. She further found that, under WSMR's current mission, it is unlikely Sigma Defense or EWA "will ever have systems or items subject to certification, operational, or developmental testing at WSTC." *Id.*

In reviewing the Agency's investigation, the inquiry is limited to whether it was reasonable in light of the OCI allegations. *Axiom*, 564 F.3d at 1381–82; *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 571 (2010) ("This standard does not allow a reviewing court to sift through an agency's rationale with a fine-toothed comb. Instead, the APA standard recognizes 'the possibility of a zone of acceptable results in a particular case.'" (citation omitted)), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011). Here, the Agency's investigation falls into that zone of acceptable results, and TRAX's allegations do not raise facts sufficient to show that the Agency's OCI investigation was unreasonable.

### E. TRAX Cannot Show Prejudice on the Remaining Factors nor Obtain a Permanent Injunction.

TRAX alleges that "[b]ut for the unreasonable and unsupported Factor 1 findings, and the false equivalency assigned to the offerors under Factor 2, there is a substantial chance that the Army would conclude that SRS's proposal is not worth SRS's $29.4 million cost premium." Pl.'s Resp. at 1. The Court need not reach this issue because Plaintiff has failed to show the Army acted irrationally or contrary to law in its evaluation. *See Bannum, Inc.*, 404 F.3d at 1351.

Likewise, the Court need not address TRAX's argument for a permanent injunction against continued performance of the Contract. *See* Pl.'s MJAR at 28–30. To succeed on a motion for a permanent injunction, a plaintiff must first succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). As TRAX fails on the merits, it cannot obtain a permanent injunction.

## VI. Conclusion

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**. ECF No. 36. Defendant's Cross-Motion for Judgment on the Administrative Record is **GRANTED**. ECF No. 40. Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record is **GRANTED**. ECF No. 39. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge